## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14–CR-30152-1-NJR** |
| | ) | |
| | ) | |
| **AYIKO L. PAULETTE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

This matter is before the Court on the Motion to Suppress Statements (Doc. 225) and the Motion to Suppress Physical Evidence (Doc. 226) filed by Defendant Ayiko Paulette. In these motions, Ayiko Paulette seeks to suppress statements he made to law enforcement officers at the St. Louis Amtrak station on July 8, 2014, as well as evidence recovered from the searches of three different homes. After the motions were fully briefed, an evidentiary hearing was held on July 15, 2015. At the hearing, Carlos Coleman, a detective with the East St. Louis, Illinois Police Department, and Duane Clauer, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, provided testimony regarding the searches and seizures at issue. The Court has fully considered the briefs and documentary evidence submitted by the parties as well as the testimony provided at the hearing. For the reasons set forth below, both motions to suppress are denied.

## FACTUAL BACKGROUND

This story begins with a late night shoot-out on March 18, 2013, in the area of a house at 2208 Saint Clair Avenue in East St. Louis, Illinois. That house is owned by Defendant Ayiko Paulette.[1] At around 10:30 p.m., officers from the East St. Louis Police Department responded to a report of gunshots at 746 North 23rd Street, which is approximately one block behind Paulette's home.[2] Stephanie Johnson, the occupant of that home, reported that she heard ten to fifteen gunshots and two bullets entered her bedroom window. Within the next half hour, officers received notice from St. Louis-area hospitals that two individuals had arrived with gunshot wounds. The first individual,

---

[1] The Court created this map to illustrate the location of events that occurred during the shootout. Ayiko Paulette's house at 2208 Saint Clair Avenue is location number one on the map.



[2] Stephanie Johnson's home is location number two on the map in footnote 1.

Dandre Easley, told police that he was shot while sitting in his car in the same block as Stephanie Johnson's house (Docs. 226, 239-1). The second individual, Ricky Johnson, told police that he was shot near the intersection of Summit Avenue and North 22nd Street, which is also approximately one block behind Paulette's home (Docs. 226, 239-1).[3]

The next morning, at approximately 8:10 a.m., East St. Louis police officers responded to a report of property damage at 836 North 22nd Street,[4] which is located around the corner from Paulette's home (Docs. 226, 239-1).[5] Hattie Allen reported that her car, which was parked on the street in front of her house, had been struck by gunfire the night before. The officers also observed bullet holes in her home. Using trajectory rods, a Crime Scene Technician ("CST") from the Illinois State Police determined that the gunshots "most likely originated" from Ayiko Paulette's home at 2208 Saint Clair Avenue (Doc. 239-1). At that point, Detective Carlos Coleman was ordered to respond to the scene. He arrived with Detective Orlando Ward at approximately 11:00 a.m.

The officers walked over to Paulette's home where they observed bullet holes in a vehicle parked in the driveway and numerous shell casings in the yard and driveway (Doc. 239-1; Government's Exhibits 5, 6). They observed at least four shell casings on the steps leading up to the back porch, and four more on the back porch itself (*see*

---

[3] The intersection of North 22nd Street and Summit Avenue is location number three on the map in footnote 1.

[4] The Complaint for Search Warrant indicates that the address of the home was 822 North 22nd Street (Doc. 239-1). Defense counsel, however, represented that the address of the home was 836 North 22nd Street (Doc. 226). Based on the exhibits submitted as evidence by the Government at the hearing, which include a photo of the house, it appears that defense counsel is correct (*see* Government's Exhibit 4). Directly beneath the front door is the house number—it appears that the first number fell off; the second number is a three; and only the top portion of the third number remains, which appears to be a six. Given that the block is the 800 block of North 22nd Street, it can be deduced that the address of the home is 836 North 22nd Street.

[5] Hattie Allen's home is location number four on the map in footnote 1.

Government's Exhibits 6–11). They also observed numerous drops of blood, a much larger spot of blood that had dripped onto the step below,[6] and bloody footprints that appeared to lead into the home (*see* Government's Exhibits 6–11).

The officers knocked on the door of the home, but no one responded. Believing that an injured person may be inside the home, the officers entered the home through a window that had been left partially open.[7] Once inside the home, the officers observed in plain view weapons, shell casings, a bulletproof vest, marijuana, and what was described at the hearing as a "massive amount of blood" (Doc. 239-1). The CST also observed bullet holes in a metal door, which indicated that shots had been fired from inside the home. Detective Coleman testified that after they checked the residence and confirmed that no one was inside, they immediately left the premises.

Detective Coleman then applied for a search warrant for the Saint Clair Avenue house in the Circuit Court of St. Clair County, Illinois (Doc. 239-1). The warrant was issued at 1:14 p.m. on March 19, 2013 (*Id.*), and executed the same day. The police recovered 118 shell casings from the home and property around the home (Doc. 239-2, p. 9). The police also recovered six firearms, ammunition, cocaine and marijuana, eighteen cell phones, five walkie-talkies, and two laptop computers from inside the home (*Id.*).

A year after the shootout, in April 2014, ATF agents met with a confidential informant ("CI") who had a history with Ayiko Paulette (Doc. 239-2, p. 10). According to the CI, Paulette was one of the leaders of a street gang in East St. Louis known as the "Waverly Crips" (*Id.*). The CI stated that he began purchasing cocaine on a weekly basis

---

[6] At the hearing, Detective Coleman characterized it as "a decent amount of blood."
[7] The window is the middle window on the driveway-side of the house and is visible in the Government's Exhibits 1, 3, and 5.

from Paulette in January 2007 (*Id.*). The CI further stated that he introduced Paulette to a cocaine source in Las Vegas in May 2007 (*Id.*). On more than one occasion, the CI traveled to Las Vegas with Paulette to purchase cocaine (*Id.*). The CI explained that he taught Paulette to transport the cocaine back to East St. Louis by making "diapers" (*Id.* at pp. 10, 15). They would put the cocaine in vacuum sealed bags, wrap the bags in black tape, and fit them on females like a "giant maxi-pad" (*Id.*).

By the time the CI spoke with ATF agents in April 2014, he was buying cocaine from Paulette every two to three days (Doc. 239-2, p. 11). He also occasionally bought heroin from Paulette (*Id.*). The CI explained that he would text message Paulette at 314-717-7343 to arrange a meet-up, Paulette would front him the drugs, and the CI would repay Paulette after the cocaine was sold (*Id.* at p. 11). The agents corroborated the CI's information by conducting two controlled buys between the CI and Paulette in May 2014 (*Id.* at pp. 11, 12–13). After each controlled buy, the agents followed Paulette back to a house at 4007 North 11th Street in St. Louis, Missouri, which agents later came to believe was his primary residence (*Id.* at pp. 12, 13).

That same month, the agents also began collecting precision location information ("PLI") on Paulette's cell phone with the number 314-717-7343 (Doc. 239-2, p. 12). Using the PLI, the agents continuously monitored Paulette's location. On July 5, 2014, the PLI indicated that the cell phone traveled from St. Louis to Texas (*Id.* at p. 14). Specifically, at 5:00 p.m. on July 5, the phone was at a Wal-Mart store in Fort Worth, Texas (*Id.*). The phone then traveled to Irving, Texas, where it arrived at the Westin Hotel at approximately 6:38 p.m. (*Id.*). The phone remained at the Westin Hotel for the rest of the

night and most of the next day, until approximately 6:24 p.m. on July 6 (*Id.*). At that time, the phone left the Westin Hotel, and it arrived at the Crowne Plaza hotel in Arlington, Texas, approximately 50 minutes later (*Id.*).

Suspicious of Paulette's trip to Texas, the agents began investigating. Agent Duane Clauer spoke with the CI and asked whether Paulette had drug sources in Texas (Doc. 239-2, p. 14). The CI indicated that Paulette had family in Houston and the Arlington/Fort Worth area, and the CI suspected that they provided Paulette with drugs (*Id.* at pp. 14–15). The CI further indicated that Paulette was currently "out of cocaine" and that he would likely be bringing back a "load" if he was in Texas, perhaps by using "diapers" (*Id.* at p. 15).

An ATF agent from the field office in Dallas went to both hotels to get information about the room reservations and who stayed in the rooms. At the Crowne Plaza hotel, the agent learned that Ayiko Paulette reserved two rooms on the night of July 6 in his name (Doc. 239-2, p. 14). Surveillance footage shows Paulette and Rochelle Coker at the reception desk checking into the hotel (*Id.*). The rooms were put in Rochelle Coker's name, and Paulette paid for the rooms in cash (*Id.*). Ten people total stayed in the two rooms, and the agent got photos of those individuals from the surveillance footage (*Id.*). Two vans from the hotel took those ten people to the Amtrak station in Dallas on July 7 (*Id.*). In other words, Ayiko Paulette was on a bus back to St. Louis within 48 hours after arriving in Texas.

Upon learning that Ayiko Paulette and his party were headed for the Amtrak station, Agent Clauer contacted an Amtrak detective and obtained a passenger

manifesto for the train from Dallas to St. Louis (Doc. 239-2, p. 15). Ayiko Paulette's name was on the manifesto along with nine other names that Agent Clauer recognized as either family, friends, or acquaintances of Paulette's, including his daughter and her mother, Rochelle Coker (*Id.* at pp. 15–16).

At that point, Agent Clauer decided to meet the train in St. Louis. It was scheduled to arrive at the St. Louis Amtrak station at 7:30 a.m. on July 8. Agent Clauer testified that approximately twenty to thirty law enforcement officials, including ATF agents, DEA agents, St. Louis City police officers, and an Amtrak Detective, were waiting in the terminal to check the IDs of everyone who got off the train.[8] They also had a narcotics detection dog to indicate whether any of the people or bags coming off the train contained drugs.

Rochelle Coker was the first member of Ayiko Paulette's party to get off the train. Agents asked to see her ID and her ticket stub, which she provided. Agent Clauer testified that she "was nervous." And the narcotics dog indicated on her bag, which prompted the agents to "detain" all ten individuals. As they each stepped off the train, they were asked for their IDs and "escorted" into a private room ("the detention room").[9]

Ayiko Paulette contends that he was in the detention room for over an hour (Doc.

---

[8] Agent Clauer testified at the hearing that Amtrak has a policy requiring everyone to have a photo ID with them to board the train. The agents were checking to make sure that the name on each individual's ID matched the name on his or her Amtrak ticket.

[9] The Government did not present any testimony or other evidence as to precisely what was said to the individuals, such as whether the individuals were asked to accompany the officers to the private room and they agreed, or if they were compelled in some way to go with the officers. Agent Clauer did testify, however, that the party members were not given a choice of whether or not to go into the detention room.

225, p. 1). According to Agent Clauer, the only question that Paulette was asked during that time was whether he knew the other individuals in the room, and he responded "no." While Paulette and his party were in the detention room, the officers detained all the bags that these individuals traveled with for a canine sniff.[10] The narcotics dog alerted on a number of the bags (although the precise number is not known); those bags were then manually searched. Additionally, an officer reviewed all of the individuals' IDs and copied down their information.[11] And all ten of the individuals were patted down for weapons.

The pat-down searches did not occur immediately because there were not enough officers in the detention room. Agent Clauer explained that some officers were still needed in the terminal to check the IDs of all the other passengers getting off the train; so, initially, there were only enough officers in the detention room "for safety reasons." Additionally, a female officer was not present to pat down the female members of Paulette's party. The pat-down searches revealed that eight individuals in the group—everyone except Ayiko Paulette and his daughter—were wearing "diapers" of cocaine. In total, the agents recovered approximately three kilograms of cocaine from those eight individuals.

At that point, the agents told Paulette that he was not under arrest and that he

---

[10] Based on Agent Clauer's testimony at the hearing, it appears to the Court that the bags were detained as the individuals entered the detention room. In other words, the individuals did not have their bags with them in the room.

[11] It is unclear when, if ever, Ayiko Paulette's ID was returned to him. It is undisputed that Paulette's ID was not returned to him while he was in the detention room. Defense counsel suggested that it was never actually returned to him. Agent Clauer seemed surprised by that suggestion, and stated that he thought the ID was returned to Paulette immediately before he left the train station. Upon further questioning, he stated that he did not personally see anyone return Paulette's ID to him, but he also did not see anyone refuse a request to return the ID.

was free to go. Before he left, however, the agents also asked Paulette if he would agree to be interviewed, and he consented. Agent Clauer took Paulette into a second private room ('the interview room") away from all the other members of his party. One other agent was also present in the interview room.

Before asking any questions, Agent Clauer again told Paulette that he was not under arrest and that he was free to go at any time. Agent Clauer then asked Paulette some background questions. In response to those questions, Paulette provided his current address, cell phone number, and home phone number. He told the agents that he was self-employed as the owner of AP Contracting and had been doing construction for twenty years. Paulette also identified one member of the party as his fifteen-year-old daughter, and he told the agents that Rochelle Coker was her mother. Agent Clauer then asked Paulette about the cocaine that was recovered off the eight individuals, and he responded "that's on them, that's their problem" (Doc. 244-1). Paulette insisted that he "did not know anything about the cocaine," and stated that he "did not want to talk about the cocaine because it did not concern him" (*Id.*). Paulette then stated that he wanted to go back to his daughter because she was really shaken up (*Id.*). The agents concluded the interview. It lasted a total of approximately five minutes. Paulette was taken back to the detention room where his daughter was waiting, and they left the train station.

A little over a month later, Agent Clauer applied for a search warrant for Paulette's primary residence at 4007 North 11th Street in St. Louis, Missouri, from a magistrate judge in the Eastern District of Missouri (Doc. 239-2). The agents wanted to

search the house for evidence related to drug trafficking, such as money; ledgers tracking the money that customers owed Paulette for the drugs he fronted; contact information for his suppliers, distributors, courtiers, and other co-conspirators; photos or videos of co-conspirators, money, or drugs; and receipts and other documents related to his drug trafficking trips. They also wanted to seize the cell phone on which they had been collecting the PLI. Agent Clauer spent a little over fourteen pages of the affidavit in support of the search warrant laying out the probable cause he had for searching the house (*see* Doc. 239-2). More specifically, he discussed his general knowledge of drug traffickers based on his experience and training, as well as all of the evidence and information gathered regarding Paulette's drug trafficking activities, including the evidence seized from the Saint Clair Avenue house, the information from the CI, the controlled buys, the PLI from Paulette's cell phone, surveillance footage and receipts collected from various businesses in Texas, the drugs and other evidence collected at the Amtrak station, and the agents' observations (*see id.*).

The search warrant for the 11th Street house was issued on August 14, 2014 (Doc. 239-2). Before it was executed, Ayiko Paulette was charged by indictment in this Court with seven narcotics and firearms offenses, and a warrant for his arrest was issued (Docs. 5, 8).[12] The search warrant for 4007 North 11th Street and the arrest warrant were executed at the same time on August 27, 2014 (Doc. 21; *see* Defendant's Exhibit D). An inventory just over two pages lists the items the agents seized from the home, including twelve bags of marijuana, a bag of cocaine, a digital scale, money, a money-counting

---

[12] Nine of Ayiko Paulette's alleged co-conspirators were also indicted and subsequently arrested (Docs. 5, 9–17).

machine, three handguns, and ammunition (Defendant's Exhibit D). The agents also recovered a variety of documents and records and numerous electronics, including thirty-four cell phones, two laptop computers, a computer tower, a memory stick, an external hard drive, and a video camera (*Id.*).

Following Ayiko Paulette's arrest in August 2014, he was detained at the Marion County Jail. While detained, he made a number of phone calls to co-defendant Loletha Eckford in which they discussed the business they co-owned, Rockstar Entertainment, LLC (Doc. 239-3, pp. 5–8). Based on the recorded jailhouse calls and bank records from the business, Agent Clauer believed that Rockstar Entertainment was a "front" business used by Paulette to conceal the money he made trafficking drugs (*Id.* at p. 8). Additionally, Agent Clauer believed that business records, banking records, and other evidence of drug trafficking were kept at a home at 1706 North 45th Street in East St. Louis, Illinois (*see* Doc. 239-3). That home is listed as the address for Rockstar Entertainment on the Illinois Secretary of State's website and bank records for the business (*Id.* at pp. 4, 5). It is owned by Ayiko Paulette's sister, Akeisha Paulette (*Id.* at p. 8). And, according to the CI, Loletha Eckford resided there for a period of time (*Id.*). Agent Clauer applied for a search warrant from a magistrate judge in this district for 1706 North 45th Street (Doc. 239-3). The search warrant was issued on October 21, 2014, and executed the next day (Defendant's Exhibit F). A one-page inventory lists the items that agents recovered from the home, including four computers, business records, financial records, and tax records (*Id.*).

## LEGAL STANDARD

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. In order to "compel respect for the constitutional guaranty," the United States Supreme Court created the exclusionary rule. *Davis v. United States*, 131 S.Ct. 2419, 2426 (2011) (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)). When applicable, that rule forbids the use of evidence obtained by police officers in violation of the Fourth Amendment. It is well-established, however, that a violation of the Fourth Amendment does not necessarily mean that the exclusionary rule applies. *Herring v. United States*, 555 U.S. 135, 140 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation.") It applies only when the benefits of deterring future Fourth Amendment violations outweighs the heavy costs of suppressing evidence. *Herring*, 555 U.S. at 141. "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free." *Herring* 555 U.S. at 141 (citing *Leon*, 468 U.S. at 908); *Davis*, 131 S.Ct. at 2427 ("Exclusion exacts a heavy toll on both the judicial system and society at large" because "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.") As a result, exclusion "has always been our last resort, not our first impulse." *Herring*, 555 U.S. at 140 (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

## ANALYSIS

### A. Motion to Suppress Statements (Doc. 225)

In this motion, Defendant Ayiko Paulette asserts that he was illegally detained at

the St. Louis Amtrak station on July 8, 2014, because the police did not have reasonable suspicion to stop him (Doc. 225). He further asserts that the duration of the stop exceeded what is permitted for an investigative detention, transforming the stop into an arrest that was not supported by probable cause (*Id.*). Either way, he was illegally seized in violation of the Fourth Amendment so the statements he made that day to law enforcement officers were the fruit of the illegal seizure and should be suppressed (*Id.*). In the alternative, he argues that his statements should be suppressed because they were given without proper *Miranda* warnings and before he was presented to a magistrate judge (*Id.*).

The resolution of Paulette's motion turns on the nature of his encounter with law enforcement officials at the Amtrak station on July 8, 2014. The Court will therefore begin its discussion by setting forth the applicable principles regarding police-citizen encounters. The Court will then examine whether any phase of Paulette's encounter with the police constituted an illegal seizure. Finally, the Court will assess whether the police were required to *Mirandize* Paulette or present him to a magistrate judge before questioning him.

### 1.   Applicable Law Regarding Police-Citizen Encounters

There are three categories of police-citizen encounters: consensual encounters, investigatory stops (often called a *Terry* stop), and full arrests. *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015) (citing *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990)). A consensual encounter is characterized by non-coercive police questioning of a citizen who voluntarily cooperates. *Shields*, 789 F.3d at 743 (citing *Johnson*, 910 F.3d at

1508). It is not a seizure within the meaning of the Fourth Amendment and requires no objective justification because it involves no restraint on the citizen's liberty. *Id.* The second category is an investigative stop, which is limited to a brief, non-intrusive detention. *Id.* An investigative stop is a seizure within the meaning of the Fourth Amendment, and police are required to have a reasonable suspicion that the individual has committed or is committing a crime. *Id.* The third category is a full arrest, which is plainly a Fourth Amendment seizure, and must be based on probable cause. *Id.*

It is obvious that not all encounters between the police and citizens involve a "seizure" within the meaning of the Fourth Amendment. *See, e.g., Johnson*, 910 F.2d at 1508. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). To determine whether a police-citizen encounter constituted a seizure, courts must look at "how a reasonable man in the suspect's position would have understood his situation." *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006) (quoting *United States v. Jones,* 21 F.3d 165, 170 (7th Cir. 1994)). That is, in view of all the circumstances surrounding the encounter, a reasonable person would have believed that he or she was not free to leave. *Shields*, 739 F.3d at 743 (citations omitted); *Barker*, 467 F.3d at 628; *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999); *Johnson*, 910 F.2d at 1509.

There are several factors relevant to this determination, including whether the encounter occurred in a public or private place; whether the suspect consented or refused to speak with the police; whether the police informed the suspect that he was not

under arrest and was free to leave; whether the police moved the suspect to another area; the number of officers present and whether they displayed weapons or physical force; whether the officers deprived the suspect of documents he needed to continue on his way; and whether the officers' tone of voice was such that their requests would likely be obeyed. *Barker*, 467 F.3d at 628–29 (quoting *United States v. Wyatt*, 179 F.3d 532, 535 (7th Cir. 1999)).

### 2.  Was Paulette Illegally Seized on July 8, 2014?

Paulette does not take issue with the police asking to see his ID and train ticket. *See, e.g., United States v. Odum*, 72 F.3d 1279, 1283 (7th Cir. 1995) ("[W]e have repeatedly emphasized that there generally is no seizure when a law enforcement agent merely approaches an individual in an airport and, after identifying himself, begins to ask routine questions relating to the individual's identification, travel plans, and ticket information.") Instead, his issue with the encounter begins at the moment the police escorted him out of the public terminal and into a private room. The officers did not give Paulette the option to decline going to the private room, nor did they indicate in any way that he was free to go. The officers also held onto his ID, which deprived him of a document that he needed to continue on his way. At this point, as the Government conceded at the hearing, the encounter was no longer consensual; it was a seizure. It is not difficult to conclude that a reasonable person in Paulette's circumstances would not feel free to walk away and would have believed he was obliged to stay put.

Because a seizure occurred, the Court must determine whether it was justified at its inception by reasonable suspicion. "The government bears the burden of establishing

reasonable suspicion by a preponderance of the evidence." *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013) (citing *United States v. Longmire,* 761 F.2d 411, 418 (7th Cir. 1985)). Reasonable suspicion requires an officer to be aware of "specific and articulable facts" that suggest the individual broke the law. *See, e.g., United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009). It is "more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Jewett v. Anders,* 521 F.3d 818, 823 (7th Cir. 2008) (citations omitted). In evaluating reasonable suspicion, courts should consider "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (citations omitted). "Ultimately, a court's determination of reasonable suspicion 'must be based on common-sensical judgments and inferences about human behavior.'" *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 125 (2000)).

According to Paulette, the police did not have reasonable suspicion to stop him because the officers only knew that he was traveling to St. Louis from Dallas by train with members of his family (Doc. 255, pp. 3, 4). But that argument ignores the knowledge that officers possessed at the time of the stop. The officers knew that Paulette was a fairly large-scale drug dealer. ATF agents had been told by a CI months prior to the stop that he bought two to three ounces of cocaine from Paulette every couple days. The CI explained that he would text message Paulette at 314-717-7343 to arrange a meet-up, Paulette would front him the drugs, and the CI would repay Paulette after the

cocaine was sold (*Id.* at p. 11). The agents then undertook efforts to corroborate the CI's information by conducting two controlled buys between the CI and Paulette. The transactions went exactly as described by the CI. After the controlled buys, the agents began collecting PLI on Paulette's cell phone. From the PLI, the agents learned that Paulette had traveled to Texas. The CI told agents that he believed that Paulette had drug sources in Texas. The CI also believed that Paulette was out of cocaine so he would be restocking if he was in Texas and that Paulette might use couriers, as he had in the past, to transport the cocaine. The agents followed up on the CI's information by obtaining surveillance footage from a hotel in Texas and speaking to the hotel manager. The agents learned that Paulette was, in fact, traveling with a group of nine other individuals, including Rochelle Coker, from Texas back to St. Louis. Once the train arrived in St. Louis, Coker was the first member of the group to get off the train, and the narcotics dog alerted on her bag at that moment.

Although not explicitly argued by the Government, it is readily apparent to the Court that, at the very least, the two controlled drug buys provided the officers with reasonable suspicion that Paulette had sold drugs on previous occasions. *United States v. Bullock*, 632 F.3d 1004, 1014 (7th Cir. 2011) ("[O]fficers can stop and detain a suspect for reasonable suspicion that the suspect has engaged in a completed felony." (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)). It fact, the controlled drug buys actually gave police probable cause to detain and arrest Paulette.[13]  All of the facts taken together also

---

[13]  Although the officers stopped Paulette based on their suspicion that he and the individuals he was traveling with were transporting narcotics, the officer's subjective reason for making the stop is not relevant. "The only relevant inquiry for Fourth Amendment purposes is whether the evidence, when objectively assessed, gave the officer probable cause for the stop." *United States v.*

provided the officers with reasonable suspicion that Paulette and the other individuals he was traveling with were presently committing a crime and transporting drugs from Texas to St. Louis. Thus the officers could detain Paulette briefly to investigate their suspicions.

Paulette also contends that, even if there was reasonable suspicion for an investigative detention, the duration of the stop eventually rendered it a de facto arrest, requiring probable cause. "For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) (quoting *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)). "An investigatory stop can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive." *Bullock*, 632 F.3d 1015 (citing *Robinson*, 30 F.3d at 784). But "[t]here is no bright-line rule as to how long an investigative detention may last[.]" *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006). Instead, when determining the reasonableness of the length of detention, courts are to look at "the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation." *Bullock*, 632 F.3d at 1015 (citing *United States v. Sharpe*, 470 U.S. 675, 685–87 (1985)). *See also Adamson*, 441 F.3d at 521 ("[W]e look to

---

*Rogers*, 387 F.3d 925, 934 n.4 (7th Cir. 2004). *See also United States v. Bullock*, 632 F.3d 1004, 1014 n.1 (7th Cir. 2011).

whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions.") Once again, the burden is on the government to demonstrate that the seizure was sufficiently limited in scope and duration to satisfy the conditions of an investigative detention. *Florida v. Royer*, 460 U.S. 491, 500 (1983).

The Court finds that Paulette was detained for a period of sixty-five minutes.[14] During that time, the identification of all ten individuals was checked and their information was written down; the narcotics dog sniffed their bags; the police manually searched the bags the dog alerted on; and all ten individuals were patted down. Paulette's attorney suggested that it should not take sixty-five minutes to accomplish those tasks when there were twenty to thirty officers present at the station. To be clear, Paulette does not contest that the officers had a reasonable basis for initiating the pat-down searches and probable cause for the luggage searches; he simply claims that they took too long. The Court is unpersuaded by Paulette's argument.

The officers were simultaneously investigating Paulette and the nine other individuals with whom he was traveling. Given the large number of subjects, it does not surprise the Court (or seem unreasonable) that the investigation took sixty-five minutes. There is no indication that the police were dilatory in their investigation. As best the Court can tell, the dog sniff was done almost immediately after the party entered the

---

[14] Paulette's detention began at the time he was escorted to the private room; this occurred moments after Paulette was asked for his ID, which according to Agent Clauer occurred at approximately 7:35 a.m. Paulette's detention ended at the moment that he was told that he was not under arrest and that he was free to leave. That occurred sometime immediately prior to his interview with Agent Clauer, which occurred at approximately 8:40 a.m., according to the Investigative Report. Paulette did not put forth any evidence or make any argument to dispute these times. Thus Paulette's detention lasted from approximately 7:35 a.m. until 8:40 a.m., a period of sixty-five minutes.

detention room. The dog alerted on more than one bag, which strengthened the officers' suspicions and gave them further reason to continue detaining the party in order to search the bags. As for the pat-down searches, it is clear that the officers were delayed for at least some period of time. Agent Clauer's unrefuted testimony was that initially after Paulette's party was escorted into the detention room, there were not enough officers available to pat down all ten individuals because some of the officers had to remain in the terminal checking IDs. And a female officer was not present to pat down the female members of Paulette's party. The officers in the detention room were there to monitor the ten individuals and maintain control of the situation until the pat down searches could be conducted. The Seventh Circuit has repeatedly upheld detentions that maintain the status quo while waiting for necessary law enforcement personnel to arrive. *See, e.g., United States v. Swift*, 220 F.3d 502, 509 (7th Cir. 2000) (holding that it would have been reasonable to hold suspects at a traffic stop for 32 minutes while waiting for officers with more information to arrive); *United States v. Scheets,* 188 F.3d 829, 838 (7th Cir. 1999) (holding it was reasonable to detain individual suspected of robbery for fifteen minutes while waiting for investigating officer to arrive); *United States v. Sterling*, 909 F.2d 1078, 1085 (7th Cir. 1990) (holding it was reasonable to detain individual suspected of drug trafficking while waiting for the arrival of narcotics detection dog and female officer to conduct a pat-down search).

The Court concludes that although the detention was out of the ordinary in terms of its length, it was not so long as to make it unreasonable under the circumstances. The officers pursued their investigation in a diligent and reasonable manner. The chosen

means of investigating—asking for identification, using a drug-detecting dog, and conducting pat-down searches—was likely to quickly confirm or dispel the officers' suspicions that Paulette and his companions were transporting narcotics. While there was a delay in the investigation, there is nothing that indicates it was an unnecessary delay for the sake of delay. Accordingly, the 65-minute detention of Paulette was reasonable and did not transform the detention into an arrest requiring probable cause.[15]

The unrefuted evidence demonstrates that Paulette was asked only one question while he was in the detention room: whether he knew the other people in the room with him. That question is undoubtedly aimed at confirming or dispelling the officers' suspicion that Paulette was using the other individuals to transport drugs. Such questions are appropriate during an investigatory stop. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) ("[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."). Accordingly, Paulette's Fourth Amendment rights were not violated, and there is no reason to suppress any statements that he made to the police while in the detention room.

Paulette left the detention room to go with Agent Clauer for questioning in another private room. A review of the surrounding circumstances reveals that this portion of the encounter was consensual. Agent Clauer's unrefuted testimony is that Paulette had been told he was not under arrest and was free to leave. Agent Clauer asked, but did not demand, that Paulette answer some questions. There is no dispute

---

[15] Even if the detention was transformed into an arrest, probable cause existed based on the two controlled drug buys, as previously mentioned. *See supra* p. 17.

that Paulette agreed to accompany Agent Clauer to the interview room, and there is no evidence that Paulette's consent was coerced. Once they were in the room, Agent Clauer again stressed to Paulette that he was not under arrest and that he was free to leave at any time. There is no evidence that the presence of Agent Clauer and the other agent was threatening, that the agents displayed their guns, physically touched him, or made any other show of force or authority. In fact, Paulette felt sufficiently free to refuse to answer the agents' questions about the cocaine found on the other members of his party. He also felt sufficiently free to terminate the interview, return to his daughter, and leave the train station. Accordingly, there was no objective (or subjective, for that matter) reason for Paulette to believe that he was not free to end the questioning and leave. This portion of the encounter was consensual and does not implicate the Fourth Amendment, and there is no reason to suppress any statements that Paulette made to the police while in the interview room.

In conclusion, no portion of Paulette's encounter with the police on July 8, 2014, constituted an unreasonable seizure in violation of the Fourth Amendment. As such, none of the statements he made to police warrants suppression.

### 3.   Did Paulette Have to be Mirandized or Presented to a Magistrate Judge?

Paulette's final argument is that his statements to police at the Amtrak station on July 8, 2014, should be suppressed because they were made before he received proper *Miranda* warnings and before he was presented to a magistrate judge (Doc. 225). Paulette's attorney argued at the hearing that his client was "in custody" during the investigatory detention. And given the officers' "understanding and belief about who

[Paulette] was and what he was doing," he should have been *Mirandized* "the moment he stepped off of the train," but certainly before he was asked any question, including identification questions.

These arguments are non-starters in light of the Court's findings that the portions of his encounter with police before and after the investigative detention were consensual and that the investigative detention itself did not ripen into a full custodial arrest. Those findings mean that he was not in custody or under arrest during any phase of the encounter with police. As such, he did not need to be *Mirandized* or presented to a magistrate judge for a probable cause hearing. *See United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006) ("The suspect must be both 'in custody' and subjected to 'interrogation' before the *Miranda* warnings are required to be administered." (citing *United States v. Abdulla,* 294 F.3d 830, 834 (7th Cir.2002)); *United States v. Johnson*, 680 F.3d 966, 975 (7th Cir. 2012) ("[W]e have previously determined that *Miranda* warnings are not required during *Terry* investigatory stops."). *See also Matz v. Klotka*, 769 F.3d 517, 527 (7th Cir. 2014) (Suspects must be presented before a magistrate judge for a probable cause determination within 48 hours of arrest).

## B.  Motion To Suppress Physical Evidence (Doc. 226)

In this motion, Defendant Ayiko Paulette asks the Court to suppress the evidence found during the search of his houses at 2208 Saint Clair Avenue in East St. Louis and 4007 North 11th Street in St. Louis, and his sister's house at 1706 North 45th Street in East St. Louis. Each house will be discussed in turn below.

### 1. 2208 Saint Clair Avenue in East St. Louis

It is undisputed that the East St. Louis police entered Paulette's home at 2208 Saint Clair Avenue on March 19, 2013, without a warrant in order to see if anyone in the house was injured or in need of assistance. Once the police confirmed that no one was inside the home, they left the premises. The police then sought and obtained a search warrant for the home based in part on what they observed during the initial, warrantless entry.

Paulette argues that the evidence seized from the home must be suppressed because the officers' initial warrantless entry into the home was illegal, and the officers then relied on their observations during the illegal entry to obtain the search warrant (Doc. 226). Therefore, Paulette argues, the evidence seized from the home is the fruit of the poisonous tree and must be suppressed (*Id.*). The Court disagrees.

"At the core of the privacy protected by the Fourth Amendment is the right to be let alone in one's home." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 550 (7th Cir. 2014) (citing *Kyllo v. United States*, 533 U.S. 27, 31 (2001)). Accordingly, "[w]arrantless searches and seizures within a home are considered presumptively unreasonable and a violation of the Fourth Amendment." *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010) (citing *United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007)). The government may overcome this presumption, however, by demonstrating that exigent circumstances existed and made the warrantless search objectively reasonable. *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). One such exigency is the "emergency aid" exception under which police "may enter a home without a warrant to render emergency assistance to an

injured occupant or to protect an occupant from imminent injury." *Id.* In determining whether the emergency aid exception justified a warrantless entry, courts must "analyze the situation from the perspective of the officers at the scene" and ask whether it was objectively reasonable for the officers to believe that an occupant was "in distress and in immediate need of their assistance." *Huddleston*, 593 F.3d at 600; *Sutterfield*, 751 F.3d at 558.

The Court finds that the officers' initial entry into the home was reasonable. At the time the officers entered Paulette's home, they knew that a shootout had occurred in the area the night before. There were bullet holes in a car and a home that were adjacent to Paulette's back yard. There were also bullet holes in a car parked in Paulette's driveway near the back door. There were a number of spent casings on the ground, at least four on the back steps, and four more on the back porch. And there was blood--enough blood that a reasonable officer could suspect that someone had been shot --and the trail of blood appeared to go up the back steps and into the back door of the house (*see* Government's Exhibits 6–11). Neither of the known victims reported to police that they were at 2208 St. Clair Avenue after being shot. These circumstances, taken together, made it reasonable for an officer to believe, at the time of the search, that a third person had been injured in the shootout the night before and may be in the house and in need of immediate aid.[16] *See United States v. Schmidt*, 700 F.3d 934, 938 (7th Cir. 2012)

---

[16] At the hearing, Detective Coleman testified that he also looked in the partially opened window and saw a dreadlock on the floor, a "massive" amount of blood, shell casings, a handgun, and a bullet-proof vest. Paulette's attorney called into question Detective Coleman's testimony, however, by pointing out that the shades on the window appeared to be down in the Government's photos of the house (*See* Government's Exhibits 1, 5). After reviewing the photos, the Court was unable to conclude one way or another whether anyone could still see into the

(holding officer was permitted to enter yard to look for wounded victims when gunshots were fired two and a half hours earlier, bullet holes were in the car adjacent to the yard and the duplex itself, and a trail of nine spent casings was on the ground nearby); *United States v. Janis*, 387 F.3d 682, 688 (8th Cir. 2004) (holding warrantless entry into home was justified when officers knew handgun had been discharged and injured someone, officers were told gun was still in the house, and officers observed puddle of blood in driveway of the house and trail of blood leading to door of house).

Paulette argues that the passage of time rendered the officers' belief unreasonable. In particular, Paulette point out that by the time of the search, over eleven hours had passed since police received the report of gunfire in the area, and thus any potential emergency situation had dissipated. But the prime exigency in this case was the potential for a wounded occupant, not whether the occupant was armed and might shoot at the police or other persons. If a victim in the house had been wounded in the shootout the night before, "that victim would not have become any less wounded after [eleven] hours had passed; to the contrary, he would need immediate aid." *United States v. Schmidt*, 700 F.3d 934, 938 (7th Cir. 2012). "It would not have made sense for an officer to wait for a warrant when a shooting victim could have been dying in the [house]." *Id.*

Paulette also points out that the police did not know for certain that the shell casings and blood were from the shootout the night before; he argues they could have been from some other incident given the high crime rate in East St. Louis. That may be

_____

house in spite of the window treatment. But the Court need not make a credibility determination regarding Detective Coleman's testimony because the Court finds that the evidence outside the house was sufficient to establish that exigent circumstances existed regardless of what the Detective may or may not have seen through the window.

true, but the officers did not need to know for certain in order to go in the house. *See Schmidt*, 700 F.3d at 938 (citing *United States v. Brown,* 64 F.3d 1083, 1086 (7th Cir. 1995) (it is unreasonable to think "that the police must stand outside [the] apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams")). *See also United States v. Porter,* 594 F.3d 1251, 1258 (10th Cir. 2010) ("Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard.") It was enough for the police to have an objectively reasonable belief that someone inside the house had been wounded in the shootout the night before. The Court therefore concludes that the officer's warrantless entry into the home was justified by exigent circumstances, and the search warrant obtained in part based on the officers' observations in the home was valid.

Even if exigent circumstances did not exist and the warrantless entry into the home was illegal, that does not necessarily mean that the search warrant was invalid. "A search warrant obtained, in part, with evidence which is tainted can still support a search if the 'untainted information, considered by itself, establishes probable cause for the warrant to issue.'" *United States v. Scott*, 731 F.3d 659, 664 (7th Cir. 2013) (quoting *United States v. Gray,* 410 F.3d 338, 344 (7th Cir. 2005)). Assessing whether a warrantless entry causally contributes to a subsequently obtained search warrant involves a two-part test. *Scott*, 731 F.3d at 664 (citing *Gray*, 410 F.3d at 344). The first question is whether the illegally obtained evidence affected the judge's decision to issue the warrant. *Scott*, 731 F.3d at 664. The second question is whether the decision to seek the warrant was prompted by information gained from the initial illegal activity. *Scott*, 731 F.3d at 664

(citing *Gray*, 410 F.3d at 344).

As to the first inquiry, "[t]he heart of this question is whether, taking away any illegally obtained information, the affidavit still demonstrated probable cause." *Brock v. United States*, 573 F.3d 497, 502 (7th Cir. 2009) (citing *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993)). The determination of probable cause "involves 'a practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Brock*, 573 F.3d at 502 (citing *Markling*, 7 F.3d at 1317).

Paulette argues that the application for the search warrant "was primarily premised on officers' earlier observation of narcotics, weapons, and ammunition in the residence," and the issuance of the warrant "was plainly based on officers' earlier illegal entry into the residence." (Doc. 226, p. 8). That is not entirely true. There were a number of other facts in the affidavit aside from the officers' observations inside Paulette's home. In particular, the affidavit also explains that the previous night, two individuals were shot in the nearby vicinity of Paulette's home, that an adjacent car and home were also damaged by gunfire, and that a preliminary reconstruction determined that the gunshots most likely originated from Paulette's house (Doc. 239-1). The affidavit further notes that officers observed spent casings in the yard, in the driveway, and on the back steps of Paulette's house, and blood leading from the back porch into the house (*Id*). These facts, while maybe not conclusive evidence, easily create "a fair probability" that the home was a crime scene and evidence of the crime would be found inside. Thus, the judge had probable cause to issue a search warrant even without the facts obtained from

the warrantless entry.

As to the second inquiry, it seems to the Court that the warrantless entry did not prompt the officers to seek the search warrant. The police knew that Paulette's home was the likely source of gunshots that injured two people and damaged two homes and a vehicle. In other words, the police had ample reason to believe that the house was a crime scene even before they went inside. Accordingly, the Court has little trouble concluding that the police would have sought a search warrant for the home even in the absence of information gleaned from the earlier warrantless entry into the home. *See United States v. Gonzalez*, 555 F.3d 579, 582 (7th Cir. 2009) (affirming district court finding that officers would have sought a warrant without illegal search, in part, because "the affidavit already reflected sufficient, legally acquired, evidence of probable cause.")

In conclusion, the warrantless entry did not taint the search warrant, and the evidence seized pursuant to the warrant was not the fruit of the warrantless entry. Consequently, Paulette is not entitled to have the evidence seized from the Saint Clair Avenue house suppressed.[17]

### 2.   4007 North 11th Street in St. Louis

Agents believed this home was Ayiko Paulette's primary residence, and as a

---

[17] At the hearing, Paulette's attorney seemed to suggest that Detective Orlando Ward's involvement in the investigation weighed in favor of suppressing the evidence seized from the house. Detective Ward was charged in May 2013 with one count of conspiracy to distribute cocaine after he provided information about law enforcement activity to drug traffickers to help them move cocaine through East St. Louis without being detected. *United States v. Ward*, case no. 13-cr-30091-7-MJR (Docs. 1, 136). Detective Ward pleaded guilty and was sentenced to 60 months' imprisonment (*Id.* at Doc. 228). There is no indication, however, that Detective Ward's criminal activities impacted this case. He was present at the Saint Clair house during the warrantless entry, but Detective Coleman testified that Ward was not the ranking officer on the scene. Additionally, Detective Coleman testified that he did not rely on Ward for anything that he included in the search warrant affidavit; all observations contained in the affidavit came from Detective Coleman or officers other than Ward.

result, evidence of drug trafficking would be found inside (Doc. 239-2). Agent Duane Clauer obtained a search warrant for this home, and it was executed on August 27, 2014 (Defendant's Exhibit D). Agents recovered a number of items from the home including thirty-four cell phones and two computers (Defendant's Exhibit D).

Paulette first argues that the evidence seized from the 11th Street house should be suppressed because the warrant application relied primarily on the evidence unlawfully seized from the previous search of Paulette's Saint Clair Avenue house and the unlawfully seized precision location information ("PLI") (Doc. 226). This argument can be summarily rejected. As discussed above, the search of 2208 St. Clair Avenue was not illegal. Additionally, the Court previously ruled that the PLI was not illegally obtained (Doc. 267, pp. 10–13). Therefore, the warrant was not tainted by illegal evidence.

Paulette next argues that, in executing the search warrant, the agents exceeded the scope of the warrant (Doc. 226). The warrant authorized police to seize only the cell phone assigned the number 314-717-7343, but they took thirty-four phones. Paulette claims that other individuals also used the residence, so searching those phones without linking them to him first was unreasonable (Doc. 226, pp. 9, 10). The police also took a computer even though the warrant did not authorize them to do so.

"The Fourth Amendment requires that a warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging through one's belongings." *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010). "The description of items to be seized limits the scope of the search to areas where those items are likely to be discovered." *Id.* The police can seize an item not described in the warrant if the item is

in plain view and the police have "probable cause to believe that the item is linked to criminal activity" given the circumstances. *Russell v. Harms*, 397 F.3d 458, 465 (7th Cir. 2005).

Here, the agents discovered the cell phones in the kitchen, the bedrooms, and the dining room—areas of the home that they had a legal right to enter and search. It is well-established that drug traffickers often have more than one cell phone.[18] Therefore, under the circumstances, the agents had probable cause to believe that the thirty-three cell phones not explicitly identified in the search warrant were also evidence of drug trafficking. While the seizure of cell phones was broad, it was nevertheless constitutionally permissible.

The seizure of the computers was also constitutionally permissible. The warrant authorized the police to search for tangible items, including but not limited to hotel receipts, restaurant receipts, and other documents depicting evidence of travel; credit card and debit card statements; financial statements; records containing names, addresses, and phone numbers of customers, suppliers, couriers, distributors, and other criminal associates; and photographs and videos of co-conspirators. Given the current

---

[18] *See, e.g., United States v. Taylor*, 471 Fed.Appx. 499, 516 (6th Cir. 2012) ("The possession of so many cell phones is also a telltale sign of drug dealing."); *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) (concluding that the defendant's possession of multiple cell phones "could [ ] be viewed by the jury as evidence of a drug-distribution conspiracy . . . particularly since a government expert testified at trial that drug dealers frequently use different cell phones to make and receive calls from their supplier, their customers, and their families."); *United States v. Rogers*, 556 F.3d 1130, 1135 (10th Cir. 2009) (admitting testimony that use of multiple cell phones is common in conducting drug business); *United States v. Bailey*, 510 F.3d 562, 567 (6th Cir. 2007) ("[D]ealers often carry two cell phones—one to contact customers and one to contact suppliers—so that if police trace the call records of their customers it will not lead to their suppliers."); Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone*, 18 RICH. J.L. & TECH. 3, 19 (2011) ("[T]he use of multiple cell phones is a common practice for drug dealing where a person uses different phones to communicate with family, suppliers, and customers.")

state of technology, it was reasonable for police officers to believe that those items would be found on the computer. *See United States v. Rutley*, 482 Fed.Appx. 175, 178 (7th Cir. 2012) (upholding search of home computer even though warrant did not mention a computer because warrant authorized search for "records" related to defendant's offenses, which were just "as likely to be on a computer as in a filing cabinet"); *United States v. Giberson*, 527 F.3d 882, 887 (9th Cir. 2008) (holding officers did not exceed scope of warrant when they seized defendant's computer, even though warrant did not list a computer, because documents authorized in warrant could be found on the computer); *Brown v. City of Fort Wayne*, 752 F. Supp. 2d 925, 939 (N.D. Ind. 2010) (same); *Fermaglich v. Indiana*, No. IP-01-1859-T/K, 2004 WL 2750262, at *29 (S.D. Ind. Sept. 29, 2004) (same).

In conclusion, the warrant was not tainted by illegal evidence, and the police did not exceed the scope of the warrant in executing it. Consequently, Paulette is not entitled to have the evidence seized from the 11th Street house suppressed.

### 3. 1706 North 45th Street in East St. Louis

Agents believed that records pertaining to Ayiko Paulette's business, Rockstar Entertainment, would be found in this house (*see* Doc. 239-3). Agent Clauer applied for and obtained a search warrant for this house on October 21, 2014; it was executed the next day (Doc. 239-3; Defendant's Exhibit F). Agents recovered a number of items from the home including four computers, business records, financial records, and tax records (Defendant's Exhibit F).

The Government argues that Paulette has no standing to challenge this search because he did not have a legitimate expectation of privacy in the house as he was not

the owner, he never resided there, and he was not present at the time the warrant was executed. The Court is extremely doubtful that Paulette has a legitimate expectation of privacy in this home but it need not resolve the issue, however, because even assuming that Paulette had standing to challenge the search, he has not articulated an argument for suppressing the evidence obtained from the search. Aside from a heading in the motion that states "Officers' Seizures in . . . October 2014 Were Illegal Because They Exceeded the Scope of the Search Warrant," Paulette does not mention the facts surrounding the search or explain his argument for suppression (Doc. 226, p. 9). Because the Court cannot ascertain the precise basis for Paulette's request to suppress the evidence, his request is denied.

### CONCLUSION

The Motion to Suppress Statements (Doc. 225) and the Motion to Suppress Physical Evidence (Doc. 226) filed by Defendant Ayiko Paulette are **DENIED**.

**IT IS SO ORDERED.**

**DATED:   August 3, 2015**

**s/ Nancy J. Rosenstengel**
**NANCY J. ROSENSTENGEL**
**United States District Judge**